THOMAS P. LENNON

*v.*

SIXTUS HEINDEL and THE SECOND NATIONAL BANK OF
HOBOKEN.

[Filed April 15th, 1897.]

1. That property sold on execution for only $6,200, when worth from $9,000
to $15,000, is not of itself ground for setting aside a sale.

2. Execution sale of land described in two parcels will not be set aside be-
cause the property was sold as a whole, there having been no preparation or
request of the sheriff for sale by the parcel.

3. Execution sale will be set aside at suit of execution debtor and of a judg-
ment debtor not protected by the sale, though induced to believe it would be;
two persons having dissuaded others from bidding and one of them having
bid it off under an arrangement that he should get it as cheap as possible and
the other (who, before such arrangement, had intended to bid) should give
him an advance of $700 on the purchase price, which he did, and it having
sold for $6,200 when worth from $9,000 to $15,000.

---

On bill, answer of Sixtus Heindel and answer and cross-bill
of the Second National Bank and replication thereto by Heindel.

*Mr. Charles L. Corbin* and *Mr. John W. Queen,* for the com-
plainant.

*Mr. William D. Edwards* and *Mr. Frederick Frambach,* for
the defendant Heindel.

*Messrs. Russ & Heppenheimer,* for the bank.

PITNEY, V. C.

The object of this bill is to set aside a sale of lands of the
complainant, made by the sheriff of Hudson county under divers
executions in the sheriff's hands against the complainant. The
Second National Bank of Hoboken was made a party defendant

because it holds a judgment against complainant which was cut off by the sale, and by its cross-bill incorporated in its answer joins in the prayer of the bill that the sale may be set aside.

The bill sets up that the complainant, in October, 1891, became the owner of five lots of land situate in Bergen township, Hudson county, containing, in the aggregate, about three and one-half acres, and that in August, September and December, 1893, and January, 1894, several judgments were entered against him in the circuit court of the county of Hudson and in the supreme court, amounting, in the aggregate, to about $3,000; that executions were duly issued on these judgments; that those issuing prior to November, 1893, were delivered to Edward P. Stanton, sheriff of Hudson county, and those issuing after that time were delivered to John J. Toffey, sheriff of the same county; that Sheriff Stanton advertised under his executions, but that the judgments and executions were assigned to the defendant Heindel before the sale and the sale dropped; and that afterwards, in December, 1893, Sheriff Toffey advertised under the executions then in his hands (being three in number) for the 1st of February, 1894, and that the sale was adjourned by Sheriff Toffey from time to time until April 26th, 1894, on which day it was sold to Heindel for the sum of $900; that the deed was made on the 28th of April and delivered to Heindel.

The bill was filed on the 28th day of May, 1894. The facts of the case are as follows: The complainant is a building contractor and apparently an active business man. He has a brother Edward, who has been a dealer in real estate, and had a sister, a Mrs. Cavanagh, who died in 1893. The complainant Thomas and his brother Edward are bachelors, and they lived for many years with their sister, Mrs. Cavanagh (until her death), and her husband and her daughters upon the premises in question. They consist of two dwellings, a stable and three and a half acres of land, situate at a place called Hudson Heights, on the Palisades, immediately back of Bulls Ferry, in Hudson county.

The premises were at first owned by Edward Lennon. He became embarrassed, judgment went against him in 1891 and the premises were sold at sheriff's sale and purchased by Thomas,

the complainant. Edward later conveyed to Thomas by deeds. Subsequently Thomas became embarrassed, and in the fall and winter of 1893–94 several judgments were entered against him. These judgments were subject to two mortgages, one for $3,000, which was a first encumbrance, and one for $500, which intervened between the judgments. Executions on two of the judgments were in the hands of Sheriff Stanton, whose term expired in the fall of 1893, and three or four later executions were in the hands of Sheriff Toffey, who succeeded Stanton. In this state of affairs the premises were advertised for sale by Sheriff Toffey for February 1st, 1894.

The judgment against Edward under which the premises were sold and bought by Thomas in 1891 was for a comparatively small amount, and the indications are that the consideration named in the deeds—$3,000—was not paid, and that, subject to whatever he paid on the judgment, Thomas held the premises in trust for his brother Edward. No direct issue was made on this subject, either in the pleadings or at the hearing. The last judgment against Thomas was in favor of the Second National Bank of Hoboken, recovered after the advertisement by Sheriff Toffey, except one or two docketed judgments from justices' courts, upon which execution was issued and delivered to the sheriff, but not mentioned in the advertisement.

The prior executions against Thomas were issued by Mr. Smythe, an attorney living in the neighborhood, and the creditors were rather urgent for their pay. In the meantime Mr. Thomas Lennon was trying to obtain loans upon the premises, but the amount required to clear off all the encumbrances was a little more than a careful investor would be inclined to loan upon it. Adjournments were had from time to time in order to give Mr. Lennon an opportunity to make arrangements for a loan. In the meantime Mr. Cavanagh, his brother-in-law, commenced an intrigue to have the property brought to a sale and bought in by somebody and held for the benefit of his daughters, who seem to have been estimable persons and to have had friends in the neighborhood. In this intrigue Cavanagh, who lived on the premises, discouraged all persons who came to look at them or

talked of loaning money or buying them at sheriff's sale, and applied to the defendant Heindel to assist him, Cavanagh, by buying in the property cheap and holding it for the joint benefit of Heindel and Cavanagh's family.    He says that Heindel gave him distinct encouragement that he would do this.    Heindel rather denies it.    But the evidence of Heindel's friend, Fahbeck, tends to corroborate Mr. Cavanagh.

Thomas Lennon also applied to a Dr. De Graff, a person of means in the neighborhood, to assist him either by loaning money or buying in the premises at sheriff's sale and holding them for him, Thomas.    He swears, in substance, that he procured from Smythe a statement of the amount due upon all the liens, and had several interviews with De Graff, and several with Smythe, and one with De Graff and Smythe together, in which latter interview the matter was discussed and the amount necessary to cover the claims was mentioned, and that he, Lennon, expressed a wish to have the property bid up to enough to cover all liens, including the bank judgment; that Smythe and De Graff objected, and advised him to cut off the bank, but that he persisted, and that finally, when they parted, it was understood that the bank's claim was to be protected, and that he, Lennon, so informed Mr. Rabe, the president of the bank, before the sale.

At the hour fixed for the sale Mr. Rabe was in the sheriff's salesroom on other business, but left just before these premises were put up for sale, in the confident supposition that if the property was sold his judgment would be covered and protected.

In this connection is to be considered the evidence of Edward Lennon, who, as we shall see, attempted to assist his brother, Thomas, in protecting the property, and who swears that on the morning of the sale, in a conversation with Mr. Smythe about the sale and the proposed purchase by Mr. Heindel, he inquired if the bank had notice that it was to be sold without further adjournment, and that Mr. Smythe said to him, " Keep quiet about that, and let the bank take care of itself, and you will have so much the less money to pay."

Edward Lennon, as we have seen, attempted to assist his brother to find some person either to make a loan to pay the judgments, or to buy the property in at their amount and hold it for the benefit of his brother. And he heard through his nieces that Mr. Heindel was inclined to assist pecuniarily, but did not understand until just before the sale that Cavanagh's plan was to have Mr. Heindel buy it in for the benefit of the nieces, cutting off Thomas and Edward. Edward called on Heindel a few days before the sale, and Heindel gave him no encouragement.

In the meantime, Thomas Lennon applied to a Mrs. Butts, a French lady of some means, who lived in the neighborhood, and who was a friend of the Misses Cavanagh, and asked her to loan the money in order to save the property. She undertook to do so, and swears—and I am inclined to believe her—that if she had had time enough she could have procured the money. She had already learned from the Misses Cavanagh that Mr. Heindel was their friend and that he talked of buying the property in to hold for their benefit. Mrs. Butts called upon Mr. Smythe to know how long the sale could be postponed in order to give her an opportunity to raise the money, and was informed by him that Mr. Heindel was making preparations to buy it; and she supposing that Mr. Heindel was buying it in the interests of the Misses Cavanagh was entirely satisfied and dropped the matter. She swears that Smythe asked her why she bothered herself with helping the Lennons, and spoke discouragingly of her doing so.

Mr. Heindel, having had his attention called to the property by Cavanagh and his daughters, looked into it, and concluded that if he could buy it cheap enough he would purchase it on his own account, and spoke to Mr. Smythe, the attorney for the creditors, and asked him to act for him, but Mr. Smythe finding that he spoke English imperfectly, sent him to Mr. Frambach, his present solicitor. Mr. Frambach examined the title and the amount of the encumbrances, and prepared to bid; and Mr. Smythe learned through Mr. Frambach or Mr. Heindel that the latter was ready to bid enough upon the property to cover all of Mr. Smythe's clients' liens.

About this time a Mr. Fahbeck intervened.   He lived in the neighborhood and had a judgment for $700 against Edward Lennon, which he desired to secure, and he believed, or suspected, that the property really belonged to Edward, although the title was in Thomas.   He called upon Mr. Heindel and made a proposition to him that he would buy it for as low a price as he could, and then sell it to Heindel for $700 advance, or enough to cover his judgment.   Heindel agreed to this upon condition that the price did not exceed a certain amount.

Then Fahbeck heard that Dr. De Graff thought of buying the property.   The fact that De Graff had been applied to by the Cavanaghs, or by one of the Lennons, to assist them with money, came in some way to Fahbeck's ears.   He called upon De Graff to dissuade him from bidding, and told him what he desired to do, and brought Heindel to see him to assure him (De Graff) that he and Heindel had made an arrangement to buy the property, by which Fahbeck would secure his judgment against Edward Lennon.   The result of the interview was that De Graff agreed not to bid on the property or to interfere with the plans of Fahbeck and Heindel.

Adjournments of the sale had been made from time to time upon the written consent of all the judgment creditors, and a day or two before the sale Edward Lennon called upon Mr. Smythe for another adjournment, and Smythe sent him out to procure the consents of all the judgment creditors, and told him that he must also have Mr. Heindel's consent because he was ready to bid enough to secure Smythe's clients and he did not wish to lose him as a purchaser.   Edward got the consent of all the judgment creditors but one, who had been paid his judgment by a joint defendant, and so the strict terms made by Mr. Smythe were not fulfilled.   Nevertheless, he applied to Heindel for his consent upon the supposition, as he swears, that Heindel was to lend the money to pay it all, and Heindel refused.   This was on the morning of the sale.   An interview was had between Heindel, Fahbeck, Smythe and Lennon in which Fahbeck declared that he was going to buy the property in at a low price so as to save his judgment against Lennon, and the result was a complete

refusal on the part of Smythe to consent to another adjournment. Edward Lennon, however, swears that he understood from Smythe that Heindel intended to buy the property in for the benefit of him, Edward Lennon, after paying the judgments, and Lennon gives this as an excuse why he did not go to the sale or pay any further attention to it. He swears that Smythe advised him to keep away. This statement of Lennon is denied by Heindel and Smythe and Fahbeck, but I am satisfied that Smythe did at least encourage Edward to stay away from the sale.

The sale took place, the property being bid up to $900, which was enough to cover all the executions in Sheriff Toffey's hands, except that of the bank, and was bid off by Mr. Frambach, as attorney for both parties, the arrangement being that the deed should be made to Fahbeck unless Heindel paid him the $700. Heindel paid Fahbeck $700, and the deed was thereupon made to Heindel. The cost of the premises to Heindel, including all taxes and previous encumbrances, with interest, but not including the amount paid his counsel and Fahbeck, was less than $6,200.

The value of the property is put by the best witnesses for the defendants at $9,000 or $10,000; others for the complainant put it as high as $15,000.

Four grounds are relied on for the setting aside of the sale.

*First.* That it was sold at too great a sacrifice.

*Second.* That the property had been laid out in parcels, and should have been sold in parcels.

*Third.* Surprise on the part of Thomas Lennon, Edward Lennon and the president of the bank, and

*Fourth.* An illegal combination between Fahbeck and Heindel to prevent bidding on the property.

With regard to the value of the property; the price obtained was not so much below what it was actually worth as to induce the court to set the sale aside, if that circumstance stood by itself. There is no pretence but that the property was advertised according to law, and the various adjournments were obtained at the request of the defendants in execution. When the prop-

erty was finally sold there was substantially no advertisement of it, but that is the complainant's fault in asking for adjournment. However, the smallness of the price is not to be lost sight of when we consider the other grounds relied upon.

The second ground is that the property should have been sold in parcels. I think this ground fails for two reasons—*first*, I am not sure that it would have sold for more if it had been sold in parcels, though it is probable that it would ; *second*, no serious request of the sheriff was made, no preparation or surveys or plots were made. The property was described in two parcels, but it was not suggested that it should have been sold in the parcels thus designated. And if the defendants in execution had wished the property sold in parcels they should have got up a scheme, maps and plots, and requested the sheriff to make the sale in that way. Next, third, as to surprise.

I think, undoubtedly, the president of the bank was surprised. He is a business man. He says that he did, indeed, have collateral for the loan, but that the collateral was of no value, and that he relied upon Thomas' credit as the owner of this real estate, and had confidence in him, and that he was assured by Thomas, two or three days before the sale, that neither he nor his solicitors, Messrs. Russ & Heppenheimer, need pay any attention to it, that the sale would either be adjourned or his judgment would be protected.

Now, in this connection comes the evidence of Mr. Thomas Lennon, which has not been denied by Mr. Smythe or De Graff, that the question of whether or not the bank's judgment should be protected in the arrangement they had on foot was discussed, and Mr. Smythe and Dr. De Graff insisted at first that it should not be protected, but finally it was agreed between them that it should be protected.

Then we have the evidence of Edward Lennon that Mr. Smythe advised him not to trouble himself about the bank's judgment but to cut that off by the sale.

And in this connection is the evidence of Mr. Smythe that he urged on the sale and declined to consent to an adjournment because he was anxious that his clients should have the benefit

of Mr. Heindel's proposed bid. He swears that they were not able to protect themselves by buying in this property. Now, it strikes one at once that Mr. Smythe, in his anxiety to protect his clients, would naturally apply to the bank, which was, presumably, rich and able to protect itself, and induce the officers of the bank to attend the sale and bid the property up to reach the executions. Instead of doing that he did not inform Mr. Rabe, the president, whom he must have seen in the salesroom—Mr. Fahbeck says that he saw him there—but allowed him to leave the room without calling his attention to the sale which was about to take place and asking him to protect his (Smythe's) clients.

These little circumstances, together with several other small matters that cropped out in the evidence—his discouraging Mrs. Butts in her offer to assist—satisfy me that Mr. Smythe, though he disavows being retained by Mr. Heindel to examine the title, &c., was, in fact and in effect, using his position to assist Mr. Heindel and Mr. Fahbeck to do precisely what they did do—buy in that property for enough to cover his clients' claims and cut off the bank for the benefit of Mr. Fahbeck.

But, without deciding at present whether or not there is enough in these circumstances to give the complainant and the bank relief, I pass to the fourth reason, which must be considered in connection with the other matters already mentioned.

The amount actually paid by Mr. Heindel to Mr. Fahbeck was $700 more than the amount of his bid. That $700 should have been bid upon the property openly and paid to the sheriff, to be applied upon the bank's execution. Instead of that, it was diverted and turned over to Mr. Fahbeck; and that was the result of a distinct, deliberate, previous arrangement, for which Mr. Fahbeck justifies himself on the ground that he had a judgment against Edward Lennon, who was the equitable owner of the property, and therefore, in equity, was entitled to obtain it. But the net result is that both the judgment of the bank against Thomas Lennon and that of Fahbeck against Edward Lennon are still outstanding and unsatisfied. No cross-bill is filed to set aside the conveyance by Edward to Thomas or to

adjust the equities between them. No proof has been offered upon which the court could base a decree that Edward Lennon was the equitable owner as against Thomas, and that Thomas had not paid Edward as much for the property as it was worth, or upon which Mr. Fahbeck could have sustained a bill in equity to set aside the conveyances under which Thomas acquired the title from Edward. The whole case, in that respect, rests upon suspicion and inference, which are insufficient to sustain a decree.

The result of the sale is a distinct injustice to Thomas Lennon, the complainant, in that it leaves the judgment against him in favor of the bank unpaid to the extent, at least, of $700, the actual amount bid by Heindel for the property, and is also an injustice to the bank, which was cut off by the sale. Such transaction will not stand the test of examination in a court of equity. It was condemned by Chancellor Halsted in *Hamburgh Manufacturing Co.* v. *Edsall, 1 Hal. Ch. 249* (at *p. 314*), and by Chancellor Runyon in *Morris* v. *Woodward, 10 C. E. Gr. 32*, and again by the same learned judge in *Van Dyke* v. *Van Dyke, 4 Stew. Eq. 176.* These cases rest on well-settled principles.

The case is not within the principle of the exceptional cases cited by defendants' counsel in support of combinations by parties to buy at public sales.

Taking all the circumstances into consideration—the price bid as compared with the actual value of the premises, the fact that the real price paid was $700 more than the bid, this result being the product of an unlawful contract to stifle bidding, the indications that there was management to prevent the bank from bidding and the direct proof of management to prevent De Graff from bidding, the fact that the president of the bank had some assurance that its judgment was provided for, and therefore did not look after the sale—I conclude that justice requires that it should be set aside.

I will hear counsel as to the terms upon which relief should be granted.